If I may, Your Honors. Please. Good morning, Your Honors. My name is Kevin Murch. I represent Dr. and Mrs. Forsythe. Excuse me. At my table is my partner, Mrs. Murch. She's here to make sure that I'm doing this correctly. This case involves a number of cases, actually, starting with the criminal case, wherein my client, Dr. Forsythe, he was charged with improperly with a number of things, but what it amounts to is he was improperly dispensing human growth hormone. The newspapers and what occurred around his indictment made it look like that's what he did solely for a living, but actually he was an oncologist who did on occasion, but not exclusively, certainly, dispense human growth hormone. What basically happened is Dr. Forsythe got into a personal, it appears, a personal fight with the FDA, and the FDA decided they would go after Dr. Forsythe, and the manner in which they went after Dr. Forsythe, we claim, was grossly incorrect and resulted in the destruction of his practice at the age of 69, the humiliation in his career, and two careers, because he was a colonel in the military until he retired, then he became a very well-known oncologist. He had done studies. He had developed products that help people today that are still alive. And he may be the greatest guy since Albert Schweitzer, but if he violates the statute of limitations, he's out. But he didn't. Okay. Why didn't he violate the statute of limitations? Why did he not violate it? Right. He did not violate the ‑‑ sorry about this. I have a little cold. He did not violate the ‑‑ I'll get you some water, if you'd like. I brought some. I mean, I have some right here. He did not violate the statute of limitations because he did not know, and I did not know, and I tried the underlying criminal case, I did not know what was occurring to him at the time. What had happened is he was charged with selling or dispensing a drug that was illegal, had never been approved. And what had happened is the FDA, they went into a grand jury and they said this drug is not approved, never has been approved, and we went to the physician's desk reference, and it doesn't show it as being approved, so it's not proved. Well, what they didn't know at the time is that ‑‑ well, they did. We found out later. Is the actual book that they're supposed to look at is this book. It's ‑‑ and this was an exhibit in trial. And it's called the Orange Book. And when did you discover the Orange Book problem? When I was brought into the case, it was approximately two months before the trial. That's when you learned about the Orange Book? That's when ‑‑ well, that's when I learned about it, because I was brought in late into the case. And when did you learn that the government hadn't checked the Orange Book? Probably after a month, a month before trial, maybe even closer to trial, because you're faced with going through thousands of documents and being told that your client's terrible and you should take all these deals and just get out of the practice of medicine at 70 and what does it matter type of thing. And so I went through everything, literally. And what I learned was this, that during trial, we learned that the documents and exhibits had been expressly, intentionally withheld from us and statements had been made not only to the district court, Judge McKibbin, but also to the jury and to other judges, magistrates, in obtaining search warrants and things like that in order to search his home, in order to search his office to find evidence of whether or not he had this so‑called illegal drug. He was acquitted on November 6, 2007, is that right? That's right. And the claim wasn't filed until November 13, 2009, which is over two years. But there's ‑‑ that's correct. Okay, so why doesn't ‑‑ why aren't you out on statute of limitations grounds? Does that count? Because of there's a formula to file under the Tort Claims Act that gives you a six‑month period of additional time, which we did file. We got it right the second time. Because of the number of lawyers that had occurred, had been in the case before, we thought that had been filed. But that gives you a six‑month stay of time while the government's deciding under the Tort Claims Act whether or not it's just going to give in or whether or not they're going to pursue it. And so the statute of ‑‑ My understanding is that the administrative claim wasn't filed until after the two years had expired. Not ‑‑ no, that's not true either. There was ‑‑ The administrative claim was not filed on 11‑13, 2009. It was filed on the court's indulgence. I wrote down all the dates. It's not inconceivable that I have the numbers wrong, but my notes say that the ‑‑ Actually, I have it right here. It was filed on November 13, 2008. 2008? Yes. And then it was sent back to us because they ‑‑ when it happened, we came in very late into this case. There was already civil attorneys involved and everything. We were under the impression that ‑‑ 11‑13, 2008, my notes say that's when the civil complaint was filed in Northern District. The ‑‑ well, maybe ‑‑ excuse me. April 29, 2009, it was filed. I'm sorry. You're right. And that's the one without the amount certain, right? That's the first form that the government rejected? Well, there was only one form. And what they did is they just sent the form back and they asked that a sum certain be placed on the form. And there was a sum. There was a sum, it said, in excess of, that was attached to the first form. And also there was the complaint attached to the first form. Right. So maybe I should, to be more specific, maybe I should refer to it as the first filing of the form and the second filing of the form for the sake of clear communication? You can look at it that way. And with all due respect, I say that. And I am a little emotional about this. I got to kind of lower myself on it because I did try the underlying case and it gets to you a little bit. What had happened is the first form went in, okay? Then the same form was sent back. And on the first form, it did list a dollar amounts. And it said, at the time, it listed, it said one of those in excess of types of statements that you put into a complaint. They wanted it to be more precise. But the problem was, with it being more precise, we would have to almost every day add to the damages because this was a doctor who every day, even after his trial, was losing patients because there were excuses that they had lost the trial. For instance, that their trial counsel had done an incorrect job and that actually my client was a drug dealer and that he was all these things he was not. And the drug in question had been approved in 1995, was in their own book, when they went into the grand jury and said that it was, you know, that it was not approved. It was approved. So could you get back to this point? Yes, ma'am. Because you were helping me to understand, and I don't want to deter you, but you were explaining why you couldn't fill in this M, certain damages were a moving target, it sounds like. They were. Could you explain that more fully, please? Yeah. He had a practice. He had a very large practice. He was the first oncologist, actually, in northern Nevada, perhaps in Nevada, that did that as board certified, as a board certified physician. And so he had a very large practice. And what occurred after, even after he won his case, there was this, and even after the first, or the SF-95 was filed, each day he was losing clients because people were saying this is the nutty doctor who sells the drugs that are illegal and he's just ripping people off. And the fact of it was that this was approved. This drug was absolutely approved for 10 years at least. And the government knew it. There was no way we could have found out. And I know under the statute of limitations they refer to a case called Gibson and the Court referred to a case called Gibson, but I believe the Davis case. I'm not sure why you couldn't find that out. Again, I don't know enough about this, but let me ask you. If they charge him with selling Penicillin and say it's not an approved drug, and you can go to the law library and pull out the orange book and look up Penicillin and see that it is an approved drug. I don't understand why you didn't know as soon as he's indicted that they charged him with a drug that wasn't really an illegal drug. Well, that's not me. It was another counsel. Oh, I mean, but he's known by what his lawyer does. And I'm sorry for stepping on your words. What had happened is they had gone into the grand jury in Nevada and they told the jury to determine what is approved and not approved is the physician's desk reference manual. And in the desk reference manual it does not show this drug called biotropin or it might be under another name, because this shows when they change the name, too. And so what happened is that previous counsel, he relied on that. He believed that that was correct. The Court believed that that was correct. When I became involved, I said, let's do some research and see, you know, is there some sort of manual out there that tells us specifically, you know, where we can find this. I mean, if his prior lawyer didn't do what you did, his problem is with his prior lawyer, isn't it? Well, no. Because the prior lawyer had had several meetings with this guy and was assured numerous times and falsely and with knowledge that it was falsely. And he had met with counsel, with district counsel and with the FDA. And this case was part of those five cases that involved improper charges being brought against certain people in the Bush administration. This was the sixth case they discussed was the Forsyth case, how there was fraud in this case. And that was discussed in Congress. And what had happened is they convinced the first attorney, who was a very well-known, very popular, great lawyer, that it was a crime, it was a felony, this drug was not approved. Look, it's not in the physician's desk reference. They convinced the grand jury of the same thing. Look, it's not in the physician's desk reference. Even when I brought this book in, which was about a month before trial, under a Frank motion, I didn't convince the judge. And I showed him the book. And the book says this is the approved drugs. And I know the standard is different. And I know we're going to probably argue some race judicata on different standards. But I couldn't convince him. And I showed him directly where it was an approved drug. And that judge went to trial. Eventually, he did dismiss at the end of their case, after their experts got up and said, no, you don't use the physician's desk reference. You use the approved orange book. They're experts. Because I asked them that question, which nobody would have asked. And I said, is that even the right book, the physician's desk reference? No, it isn't. So this drug is an approved drug. Yes, it is. So why is my client sitting behind the defense table worrying about going to jail for the rest of his life at 70 years old or 69? Counsel, I wonder if you might want to reserve a couple of minutes to answer the government's argument. Yes, I would. Yes. Thank you. Thank you. Good morning. Good morning. May it please the Court. Melanie Proctor, Assistant United States Attorney. I represent the United States and Agent Zielinski in this matter. The Fourth Cites today ask the Court to give them a fourth bite at the apple. However, their claims are simply too late or not subject to the Court's jurisdiction. Their tort claims for negligence and negligent entrustment and the Bivens claims accrued on September 27, 2006, when Dr. Forsythe was indicted. His malicious prosecution claim accrued on November 6, 2007, when he was acquitted and the charges were dismissed. The request for declaratory judgment fails because the Forsythes apparently are seeking an advisory opinion. For these reasons, as well as the others stated in the answering brief, the government asks the Court to affirm the well-reasoned decision by the district court. I would like to respond to some statements made by opposing counsel. To the extent the Court has any concerns about whether the drug at issue was an approved drug, that issue was addressed by the government in response to the Franks motion that was made, and there's an extensive discussion of that issue. There in that motion, which is in the administrative record, in the record before the Court. Also, I would like to note that in response to some allegations that are made into the briefing, the government elected to submit some documents from the criminal trial. I believe you received those on Tuesday, and I submitted paper copies to the Court today, and ensured that opposing counsel had copies of those documents. If the Court has no questions for the government, then we will submit on the briefing. I'm okay on the briefing. Thank you. Thank you very much, Ms. Crawford. Mr. Merch, you've got a little less than two minutes left. I probably won't need that, because it's pretty well stated. Under the Franks case, where they state that it was already determined, the standard under Franks is clear error. Also, what's important under the malicious prosecution case, and I think it's foot north 4 or 5 in the California Federal case, they stated that the statute of limitations started to run at the, when the, on that claim, when the case was dismissed or at the point in time where Dr. Forsyth won the case. One thing that, and so it was way past the beginning when he's first indicted, because he doesn't know what is going on when he's first indicted. So one of the things that occurred, and I think this is really important, is that the, there was a, an FBI man, I can't think of his name, who was in charge of, he originally was an FBI man. He was in charge of the investigation. And then he was fired from the FBI because he had had, he had a stroke and he didn't disclose it. His gun was taken from him because of safety reasons. That was okay. But then he had another case where he did the exact same thing, set up another person, and it's all briefed. And that person had to go through this same living hell of being accused of a crime. During trial, and, and what is a big part of this case, I said to the judge, I have not received all the documents. I have asked for them. I think you can tell I'm very assertive, and it probably gets me into trouble. But I asked for it, and I said, I'm entitled to it. I believe that I'm not getting these documents. And what had happened was they sent, they sent me over and, and were ordered to give me every document. This was, they said, this document, which is a box that used to contain a drug. They made me give it back to them. It was what they found and they said in, in Dr. Forsythe's office. I see you're out of time. Can I just? Finish your sentence and then wrap up. Okay. This, this has another doctor's name on it. It's a prescription from another doctor's office. It was just, this was made up, made up evidence that they have no explanation for, and we couldn't have known until trial because they were hiding it in Tulane. Thanks for letting me use that. Got you. Thank you very much. I'm sorry if I was a little rough. That's okay. Thank you, Your Honor. Thank you, Ms. Proctor, too. Thank you. The case just argued is submitted as standard assessed for this session. Thank you.
judges: Silverman, Gould, Christen